NOT DESIGNATED FOR PUBLICATION

No. 114,447

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MAXWELL D. ANDERSON,
*Appellant*.


MEMORANDUM OPINION

Appeal from Republic District Court; STARLA L. BORG NELSON, judge. Opinion filed July 22, 2016. Affirmed.

*Maxwell D. Anderson*, appellant pro se.

No appearance by appellee.


Before GREEN, P.J., MCANANY and ATCHESON, JJ.


*Per Curiam*:  Defendant Maxwell D. Anderson appeals his conviction and resulting fine for speeding following a bench trial in the Republic County District Court. Representing himself throughout the trial and appellate proceedings, Anderson unleashes both what might be regarded as technical challenges to the prosecution and broad constitutional attacks. Ultimately, we find no valid grounds for reversing the conviction and, therefore, affirm the judgment.

Late in the afternoon on May 16, 2015, Kansas Highway Patrol Trooper Justin Davis used a radar unit in his patrol car to measure the speed of an automobile driven by

Anderson at 86 mph on a section of Highway 81 with a posted limit of 70 mph. We infer from the record the radar to have been a Stalker DSR 2X. Davis pulled Anderson over and issued him a citation for operating a motor vehicle in excess of the posted speed limit, a traffic infraction under K.S.A. 2015 Supp. 8-1558.

Anderson pled not guilty and requested a trial. In due course, he filed motions for discovery and to dismiss. The district court ordered the State to produce any evidence in its custody or control that "would be used against" Anderson. Anderson sought to dismiss the prosecution on the grounds the citation was legally insufficient and because the State would be unable to prove the radar unit's reliability. Anderson later filed a motion contesting the adequacy of the discovery the State provided.

Before starting the scheduled bench trial on August 11, the district court heard argument on Anderson's motions and denied them. Davis testified at trial to his training in using the radar unit and the steps he took to check its accuracy the day he stopped Anderson. The State also introduced the manufacturer's certificates attesting to the accuracy of the radar unit and of the tuning forks field officers regularly use to check the machine's continued accuracy. Anderson did not testify. The district court found Anderson guilty and fined him $81, plus $108 in costs.

This court granted Anderson's motion to appeal out of time. Anderson has filed a lengthy brief, raising half a dozen points of claimed error. The State chose not to submit a responsive brief. We take up Anderson's arguments and augment the factual and procedural history as necessary to address them.

LEGAL ANALYSIS

*Legal Sufficiency of Traffic Citation*

Anderson contends the citation was defective and of no legal force because it did not include a "state registration number" for his car as required by K.S.A. 8-2106(b) and K.S.A. 8-2108. Accordingly, he says the case should have been dismissed based on that statutory defect. Alternatively, he contends the omission either deprived the district court of subject matter jurisdiction, rendering the conviction void, or violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution. We address and dispose of those arguments together and need not delve into legal principles bearing on standing or due process. Anderson's foundational premise—that the citation was flawed—is wrong. In turn, the arguments based on that premise similarly lack merit.

As provided in K.S.A. 8-2108, a citation for a traffic offense, such as speeding, must be in a form that includes the information required in K.S.A. 8-2106. And K.S.A. 8-2106(b) mandates that a citation contain specific information about the offense, the driver, and the motor vehicle, including the "state registration number of the person's vehicle, if any." The citation identifies Anderson as a resident of Omaha, Nebraska, and lists a Nebraska license plate number for his car. Anderson doesn't dispute that information.

Under Nebraska law, a motor vehicle's registration number is the designation appearing on the assigned license plate. Neb. Rev. Stat. § 60-389 (2010) (Nebraska motor vehicle department "shall . . . assign to such motor vehicle . . . a distinctive registration number in the form of a license plate"). The citation issued to Anderson contained his car's license plate number and identified Nebraska as the licensing state. The citation, therefore, satisfied the legal requirements of K.S.A. 8-2106 and K.S.A. 8-2108. All of Anderson's arguments based on a contrary notion fail for that reason.[1]

3

[1]When Anderson was stopped, Kansas issued registration numbers different from license plate identifications for vehicles registered in this state. The state registration number appeared on the annual decal affixed to the license plate. Since July 2015, the decals bear an identification that matches the assigned license plate. See K.S.A. 2015 Supp. 8-134(e). Anderson tried to fashion an argument based on the system for vehicle registration in Kansas that used separate license plate identifications and state registration numbers. But K.S.A. 8-2106(b) simply requires a state registration number *if any*, recognizing that some states may not use them at all. As we have explained, Nebraska uses the license plate identification as the registration number. So a traffic citation that includes the license plate identification for a Nebraska motor vehicle satisfies K.S.A. 8-2108.

*State's Compliance with* Brady *Obligation*

Anderson next argues the State failed to provide the serial number of the Stalker DSR 2X Davis had in his patrol car, the radar training materials the Kansas Highway Patrol uses with troopers, and Davis' scores on any examinations given to him during his training on the radar equipment. The district court did not order the State to produce that information in response to Anderson's discovery requests. On appeal, Anderson characterizes the failure of the State to provide that information as a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), requiring the government to turn over exculpatory evidence to a defendant in a criminal prosecution. The State's failure to comply with *Brady* violates a defendant's constitutional right to due process. *State v. Warrior*, 294 Kan. 484, 504, 277 P.3d 1111 (2012). The State has an obligation to provide a defendant with *Brady* material even without a court order.

Evidence is exculpatory if it tends to disprove a fact in issue that is material to guilt or punishment or if it may be used to impeach inculpatory evidence or witnesses of the prosecution. See *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *State v. Lackey*, 295 Kan. 816, 823, 286 P.3d 859 (2012). A *Brady* violation, then, requires: (1) evidence favorable to the defendant either because it is exculpatory or impeaching; (2) the State's willful or inadvertent suppression of that

4

evidence; and (3) prejudice to the defendant based on the materiality of the withheld evidence. *Warrior*, 294 Kan. at 506. In this context, withheld evidence is material if its disclosure would have created a reasonable probability of a different result at trial. 294 Kan. at 507.

Anderson asserted his constitutional claim based on *Brady* for the first time on appeal. We could fairly discard the claim for that reason. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015). But Anderson's argument also fails substantively since he has not shown that the requested information would have been exculpatory at trial. He simply offers possible scenarios in which it might have been helpful in his defense. For example, he says with the serial number he could find out if the manufacturer had repaired the specific radar unit or otherwise determined it to have been malfunctioning at some time. Or, he says, the Highway Patrol training may have been inadequate. But Davis testified about his classroom instruction and in-field training using radar. He also explained how he operated the Stalker DSR 2X on the day he stopped Anderson.

At trial, Anderson offered and the district court received as evidence the manufacturer's 47-page operating manual for the Stalker DSR 2X. So Anderson had the manual available to cross-examine Davis and to challenge the way he tested and ran the radar. A deviation from the procedures in the manufacturer's operating manual would tend to undercut the reliability of the speed readout Davis received. That would affect the weight of the evidence favoring a conviction. By comparison, the Highway Patrol training materials are quite collateral. Whether Davis adhered to the absolute letter of his training has nothing directly to do with whether he used the Stalker DSR 2X the way the manufacturer intended to achieve optimal results. Armed with the operating manual, Anderson had the materials he needed to explore whether Davis properly operated the Stalker DSR 2X.

In short, Anderson has advanced no concrete basis to suggest a *Brady* violation. The concerns he has raised at this stage are far too speculative to warrant relief in the form of a new trial. See *United States v. Morales*, 746 F.3d 310, 317 (7th Cir. 2014); *Beltran v. Harrington*, No. CV 10-5525-GW, 2015 WL 1517771, at *28 (C.D. Cal. 2015) (unpublished opinion).

*Foundation for Radar Readout*

Anderson next argues the district court should not have admitted testimony or other evidence as to the speed readout Davis got from the radar because the unit had not been examined within a year by the manufacturer or someone else trained to determine that the internal systems were functioning properly. As Anderson acknowledges, he asks us to impose a new, restrictive rule of admissibility for radar evidence.

As Anderson also acknowledges, a district court's ruling on the admissibility of otherwise material evidence—and a radar readout is plainly material in a contested speeding case—typically will be reviewed on appeal for abuse of discretion. *State v. Boleyn*, 297 Kan. 610, Syl. ¶ 1, 303 P.3d 680 (2013); *Wendt v. University of Kansas Med. Center*, 274 Kan. 966, 975, 59 P.3d 325 (2002). A district court exceeds that discretion if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106, *cert. denied* 134 S. Ct. 162 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

In *State v. Primm*, 4 Kan. App. 2d 314, 606 P.2d 112 (1980), this court outlined the requirements for admitting as evidence radar readings of vehicle speeds. The proponent of the evidence has to establish the radar unit functioned accurately when

6

making the reading. 4 Kan. App. 2d 314, Syl. ¶ 2. The foundation evidence must demonstrate: (1) the operator tested the radar unit in accordance with accepted procedures; (2) the radar unit responded within the designated specifications for that testing and otherwise appeared to be working properly; and (3) the operator had adequate training and experience with the equipment. 4 Kan. App. 2d 314, Syl. ¶ 3. The *Primm* decision also recognized district courts could take notice of the general reliability of the science underlying the radar measurement of speeds of moving vehicles. 4 Kan. App. 2d 314, Syl. ¶ 1. Thus, the proponent of a radar readout does not have to produce evidence outlining the scientific principles and a testifying law enforcement officer need not be familiar with, let alone understand, those principles.

As we have said, at trial, Davis generally described the classroom and in-service training he received in using the Stalker DSR 2X. Davis testified that on the day he stopped Anderson, the internal testing mechanism for the Stalker DSR 2X showed the unit to be working properly. Davis explained that he also tested the unit at the beginning and end of his shift that day with two tuning forks that vibrate at different frequencies. The tuning forks, supplied by the manufacturer of the Stalker DSR 2X, simulate the reflected signal the radar picks up from moving vehicles, and because the tuning forks have different known frequencies, the radar should report different readouts, each within a narrow specified range, if the unit is operating correctly. Davis testified the tuning fork protocol showed the Stalker DSR 2X to be functioning as intended. The State also introduced and the district court received in evidence a certificate from the manufacturer showing the radar unit to have been certified as accurate on May 31, 2013, and similar certificates from the manufacturer showing the tuning forks to be accurate as of that date.

On appeal, Anderson effectively concedes the State produced sufficient evidence to satisfy the *Primm* foundation for admitting the readout Davis got from the Stalker DSR 2X. But Anderson argues the accuracy of radar units may decline over time and the longer a given unit goes without examination and maintenance by a trained technician the

7

more likely it will be inaccurate. He says the same holds true for retesting the frequencies at which the tuning forks vibrate. Anderson asks us to adopt an irrebuttable presumption or per se rule that would exclude as evidence all readings from a radar unit that hasn't been professionally examined and certified as accurate in more than a year.

In support of that rule, Anderson cites four court decisions and a 35-year-old law review article. We are unpersuaded. In *People v. Walker*, 199 Colo. 475, 481, 610 P.2d 496 (1980), the Colorado Supreme Court held that "[if] a tuning fork test is used to calibrate a radar device, . . . the prosecution must show that two tuning forks have been used, or, alternatively that the single tuning fork used has been certified as accurate within one year of the test." The court recognized that in testing with dual tuning forks, each result tended to corroborate the other, considerably enhancing confidence in the accuracy of the radar unit. 199 Colo. at 480. So Anderson's reliance on *Walker* is wholly misplaced. The case actually recognizes the testing procedures Davis used to be sufficient to admit radar readouts. Anderson also cites *City of Aurora v. McIntyre*, 719 P.2d 727, 729 (Colo. 1986), which applied the holding in *Walker*, and *United States v. O'Shea*, 952 F. Supp. 700, 701-02 (D. Colo. 1997), which cited *Walker* with favor. Neither helps him. Anderson invites us to consider *Cromer v. State*, 374 S.W.2d 884 (Tex. Crim. 1964), where the court upheld the sufficiency of the evidence for a speeding conviction based on a readout from a radar unit tested both with a single tuning fork and by using it to measure the speed of the patrol car in comparison to fixed objects. A dissenting judge in *Cromer* would have reversed the conviction because the State presented no evidence the tuning fork had been calibrated or that the speedometer of the patrol car was itself accurate. 374 S.W.2d at 887-88 (Morrison, J., dissenting). Nothing in *Cromer* even hints at a per se rule of the sort Anderson promotes. In Trichter and Patterson, *Police Radar 1980: Has the Black Box Lost its Magic?* 11 St. Mary's L.J. 829, 859 (1980), the authors recommend, among other things, that manufacturers annually certify the accuracy of radar units. But they offer no particularized explanation for that precise recommendation apart from the general idea that periodic examination of radar units would turn up

operational problems. Anderson points to no jurisdiction that has taken up that recommendation.

In this case, we have been offered no good reasons to jettison or even augment the evidentiary requirements set out in *Primm*. And we are not disposed to upset settled rules without good reason.

*Confrontation Clause Considerations*

On appeal, Anderson contends the admission of the certificate of accuracy for the Stalker DSR 2X and the certificates of accuracy for the tuning forks violated his right to confront witnesses against him as guaranteed in the Sixth Amendment to the United States Constitution because the persons performing the testing and preparing the certificates did not testify at trial and, therefore, were not subject to cross-examination—the essence of the Confrontation Clause. See *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *California v. Green*, 399 U.S. 149, 157-58, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970). Before turning to the substantive issue, we mention that Anderson made no trial objection to the certificates for the tuning forks. The absence of a contemporaneous trial objection, as required in K.S.A. 60-404, precludes appellate review of any claimed error, including a constitutional deficiency. See *State v. Moore*, 302 Kan. 685, 697-98, 357 P.3d 275 (2015). Here, the legal issue presented on appeal with respect to the three documents is identical, and nothing would factually distinguish the radar certification from the tuning fork certifications in this case.

The right of confrontation does not bar the admission of all extrajudicial statements against a criminal defendant. The right covers those statements considered "testimonial." *Bullcoming v. New Mexico*, 564 U.S. 647, 657-58, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); *Crawford*, 541 U.S. at 60. Broadly cast, testimonial statements are those "'establish[ing] or prov[ing] past events potentially relevant to later criminal

9

prosecution.'" *Bullcoming*, 564 U.S. at 659 n.6 (quoting *Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 [2006]). Thus, for example, when a law enforcement agency submitted seized evidence believed to be an illegal drug to a lab for analysis, the chemist's resulting report, made under oath, identifying the white powder to be cocaine was indisputably testimonial. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309-11, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009). Likewise, an unsworn report of a forensic examiner as to the alcohol level in a blood sample submitted by law enforcement officers was testimonial in a drunk driving prosecution. *Bullcoming*, 564 U.S. at 664-65. The reports, therefore, should not have been admitted because the persons performing the reported testing were not subject to cross-examination by the defendants. The common theme uniting them and rendering them subject to the Confrontation Clause was an objective declarant's reasonable belief the statements would be used in a later judicial proceeding. *Melendez-Diaz*, 557 U.S. at 311; see *Bullcoming*, 564 U.S. at 663-64 (citing *Melendez-Diaz*). In other words, the chemist and the forensic examiner would have expected the information in the reports to be relevant in some criminal case.

The Kansas Supreme Court applied those principles in *State v. Benson*, 295 Kan. 1061, 1067-68, 287 P.3d 927 (2012), to find that a certificate attesting to a periodic calibration of an Intoxilyzer 5000, used to determine a person's blood-alcohol level from a breath sample, was not testimonial and, therefore, could be admitted as evidence without running afoul of the Confrontation Clause. The court held that the certificate was "generated as part of the regular equipment maintenance" and "speaks only to the reliability of the evidence that [a defendant's] blood alcohol level was above the legal limit [but] does not prove or disprove that element." 295 Kan. at 1067. The holding in *Benson* applies by direct analogy to the manufacturer's certificate stating the Stalker DSR 2X unit performed accurately on May 31, 2013, and compels the same conclusion—the admission of the certificate does not implicate the constitutional right of defendants in speeding cases to confront the witnesses against them.

If anything, that rationale applies with greater force to the certificate for the radar unit. To admit breath test results in a driving-under-the-influence case, the State *must* show the particular machine used to perform the test has been certified by the Kansas Department of Health and Environment. *State v. Ernesti*, 291 Kan. 54, 62-63, 239 P.3d 40 (2010). That is, the certification forms part of the necessary evidentiary foundation to admit the result. The same, however, is not true of the certificate for a radar unit used to determine the speed of a motor vehicle. As outlined in *Primm*, the evidentiary foundation for a radar readout requires only that the law enforcement officer have been trained to operate the unit and the officer's testimony that he or she properly tested the unit and it appeared to be functioning correctly. 4 Kan. App. 2d 314, Syl. ¶ 3. There is no *requirement* the State produce evidence the manufacturer or some other entity has examined a radar unit and determined it to be accurate. Such evidence, though unnecessary, would provide some circumstantial support showing the radar unit to be reliable and, hence, the readout to be accurate. But based on *Benson* that evidence would not be testimonial.

As Anderson points out, a subsidiary rationale offered in *Benson*, 295 Kan. at 1066-67—that the certificate for the Intoxilyzer 5000 was not produced for use in a specific case or against a particular defendant—is suspect in light of *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221, 183 L. Ed. 2d 89 (2012). In that case, five justices rejected the government's argument that the Confrontation Clause did not apply to a reported DNA profile because the profile had not been produced primarily for the purpose of charging or prosecuting the defendant. See 132 S. Ct. at 2261-64 (Thomas, J., concurring in judgment); 132 S. Ct. at 2273-74 (Kagan, J., dissenting).[2] Notwithstanding *Williams*, the ultimate holding in *Benson* seems to be intact and governs here.

[2]In *Williams*, the defendant argued a violation of the Confrontation Clause impermissibly tainted his state court conviction for rape, when a government expert testified to an inculpating DNA match and outlined her reliance on a report from an independent laboratory establishing the DNA markers found in biological evidence

11

recovered from the victim shortly after the crime. No one from the independent laboratory testified at trial or was ever subject to cross-examination about the report. In an opinion written by Justice Alito, four justices voted to affirm the conviction because the report was not testimonial, in part, because it was not generated for the principle purpose of prosecuting or "targeting" the defendant. *Williams*, 132 U.S. at 2242-44. Writing for himself, Justice Thomas expressly rejected that reasoning but voted to affirm because the report lacked what he viewed as the requisite "formality and solemnity" to be testimonial for purposes of the Confrontation Clause. 132 U.S. at 2255, 2273-74 (Thomas, J., concurring in judgment). The remaining four justices rejected entirely the reasoning advanced in Justice Alito's opinion and dismissed Justice Thomas' view of the Confrontation Clause. 132 U.S. at 2265 (Kagan, J., dissenting). Those justices would have found a violation of the Confrontation Clause. So five justices voted to affirm the conviction but could not agree on why. But five justices refused to confine the Confrontation Clause to evidence generated primarily to advance a particular criminal case or the prosecution of a particular defendant.

Even if we were mistaken and the admission of the certificate of accuracy for the Stalker DSR 2X (and the tuning fork certificates, for that matter) violated the Confrontation Clause, Anderson has failed to show material prejudice depriving him of a fair trial. Most trial errors, including constitutional ones, do not afford a defendant relief if, under the circumstance, they are harmless. The harmless-error rule applies to Confrontation Clause violations. *Bullcoming*, 564 U.S. at 668 n.11; *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); *State v. Holman*, 295 Kan. 116, 143, 284 P.3d 251 (2012). A constitutional error may be treated as harmless when the party benefiting from the error, here the State, can show beyond a reasonable doubt that the outcome of the trial was not affected. *Holman*, 295 Kan. at 143; *Ward*, 292 Kan. 541, Syl. ¶ 6.

In his brief, Anderson has not addressed harmlessness. Having reviewed the record, including the trial transcript, we fail to see any substantive prejudice to Anderson. The certificate of accuracy provided nothing more than cumulative evidence that the Stalker DSR 2X was working properly when Davis spotted Anderson racing through Republic County. Davis testified that the Stalker DSR 2X's internal calibration system indicated the unit to be functioning correctly. The radar responded appropriately when

12

Davis tested it with the dual tuning forks. And he otherwise saw nothing suggesting the unit might have malfunctioned. As we have said, all of that satisfied the evidentiary foundation outlined in *Primm*, and those distinct tests and observations provided redundant checks supporting the accuracy of the radar readout.

In short, no evidence called into question the functionality of the Stalker DSR 2X or its determination of the speed of Anderson's car. And ample properly admitted evidence showed the readout to be correct. The certificate of accuracy simply gilded the evidentiary lily.

Had the prosecutor vouched for the certainty of the evidence based on the manufacturer's certificate and waved it around in front of a jury, we might linger a bit longer over the matter of harmlessness. But this wasn't a jury trial, and the prosecutor didn't even mention the certificate in a closing argument that lasted less than 2 minutes. In a detailed bench ruling immediately following the trial, the district court specifically relied on the evidentiary standards outlined in *Primm*, Davis' training, and his testimony as to his testing and observation of the radar unit the day he stopped Anderson. The district court mentioned the certificate only in passing. In light of the trial evidence and the record as a whole, we conclude without hesitation that the certificate had no demonstrable impact on the district court's decision to convict Anderson. Any violation of the Confrontation Clause, therefore, would have been harmless.

Having addressed Anderson's arguments on appeal, we find no basis to reverse his conviction and the resulting fine.

Affirmed.

13